# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | Martin C. Ashman | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 03 C 794 | **DATE** | 9/7/2004 |
| **CASE TITLE** | Linda L. Beamon vs. Hewitt Associates, LLC | | |

**MOTION:**

[In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]

(2) ☐ Brief in support of motion due _____.

(3) ☐ Answer brief to motion due_____. Reply to answer brief due_____.

(4) ☐ Ruling/Hearing on _____ set for _____ at _____.

(5) ☐ Status hearing[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(7) ☐ Trial[set for/re-set for] on _____ at _____.

(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.

(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
    ☐ FRCP4(m)   ☐ Local Rule 41.1   ☐ FRCP41(a)(1)   ☐ FRCP41(a)(2).

(10) ■ [Other docket entry]   Enter memorandum opinion and order. Defendant Hewitt Associates, LLC's motion for summary judgment [22-1] is granted.

(11) ■ [For further detail see order attached to the original minute order.]

| | | |
|---|---|---|
| | No notices required, advised in open court. | |
| | No notices required. | |
| ✓ | Notices mailed by judge's staff. | |
| | Notified counsel by telephone. | |
| | Docketing to mail notices. | |
| ✓ | Mail AO 450 form. | |
| | Copy to judge/magistrate judge. | |

| | | | |
|---|---|---|---|
| | | courtroom deputy's initials | |
| IS | | | |

2
number of notices

SEP 1 8 2004
date docketed

docketing deputy initials

9/7/2004
date mailed notice

IS
mailing deputy initials

Document Number

40

CLERK, U.S. DISTRICT COURT
2004 SEP -7 PM 4: 36
Date/time received in central Clerk's Office

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | | |
|---|---|---|
| LINDA L. BEAMON, | ) | |
| | ) | |
| Plaintiff, | ) | Case No. 03 C 0794 |
| | ) | |
| v. | ) | Magistrate Judge |
| | ) | Martin C. Ashman |
| HEWITT ASSOCIATES, LLC, | ) | |
| | ) | |
| Defendant. | ) | SEP 0 8 2004 |

## MEMORANDUM OPINION AND ORDER

Plaintiff Linda L. Beamon filed a one-count employment discrimination complaint against Defendant, Hewitt Associates, LLC ("Hewitt"), alleging retaliation under the Civil Rights Act of 1964, 42 U.S.C. § 2000(e) (Title VII). Hewitt has moved for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure.[1] For the following reasons, Hewitt's motion is granted.

## I. Background

### A. The Parties

Plaintiff was employed by Hewitt from August 2000 to November 2001 as a customer service associate ("CSA"). As a CSA, Plaintiff administered health and retirement benefit plans to Hewitt's clients. Initially, Plaintiff worked on a client team serving Morgan Stanley, but because that team was phased out, Plaintiff transferred to a client team serving Xerox

---

[1] The parties have consented to have this Court conduct any and all proceedings in this case, including the entry of final judgment. *See* 28 U.S.C. § 636(c); Local R. 73.1(a).

Corporation in February 2001. Plaintiff was trained to use the policies and procedures specific to Morgan Stanley and later to Xerox.

### B.    Plaintiff's Supervision Under Steve Bryant

When Plaintiff transferred to the Xerox client service team she remained under the supervision of Sarah Raines through April 2001, and in May 2001 Steve Bryant became her supervisor. While under Mr. Bryant's supervision, Plaintiff was rated on a monthly basis by a coach who would monitor her calls. Her scores were based on (1) the accuracy of the information she provided to the caller, and (2) the manner in which she communicated with the caller, a performance factor referred to as "MAGIC," which stands for "Making A Good Impression on the Customer." MAGIC skills entail greeting a caller appropriately, using a caller's name throughout the call, and thanking the caller at the end.

Hewitt's supervisors are expected to review their associates once a month to discuss their performance. Mr. Bryant met with Plaintiff in May 2001 and told Plaintiff that her MAGIC and accuracy scores were unsatisfactory and that she needed to improve her scores immediately. (Bryant Decl. ¶ 18.) However, Plaintiff responded that she had never been given formal training in MAGIC skills at the time of this review and her former supervisor, Ms. Raines, had informed Mr. Bryant of this fact. (Beamon Dep. at 36-37, 42-44.)

Mr. Bryant did not meet with Plaintiff in June 2001, stating that they could not meet because Plaintiff was on vacation during the scheduled meeting. (Bryant Decl. ¶ 19.) Mr. Bryant did meet with other Xerox employees on a monthly basis. (Pl.'s Am. Resp. to Local R. 56.1 Stmt. ¶ 18.)

In July and August of 2001, Plaintiff met with Mr. Bryant for their monthly performance meetings. In July 2001 Mr. Bryant informed Plaintiff her MAGIC scores were very low, though her accuracy scores were improving. (Bryant Decl. ¶ 20.) Plaintiff had still not yet been properly trained on MAGIC skills. At their August 2001 meeting, Mr. Bryant informed Plaintiff that she was still performing at a below satisfactory level. (Bryant Decl. ¶ 21.) Mr. Bryant then claims he arranged for additional coaching to help Plaintiff improve. (Id.) However, Plaintiff did not receive a coach until October 2001 when she was placed on the performance improvement plan. (Beamon Dep. at 46.) Mr. Bryant did not meet with Plaintiff during the month of September 2001.

### C.    Performance Improvement Plan

On October 16, 2001, Plaintiff was placed on a sixty-day performance improvement plan because she was still having problems with her MAGIC skills. Plaintiff reminded Mr. Bryant she had not received a coach pursuant to their August 2001 meeting and a coach was assigned to provide additional training and information regarding how she could improve her phone calls. The coach sat with Plaintiff approximately one hour a week, listened to her calls and provided immediate review. Plaintiff now also met once a week with Mr. Bryant so that he could closely monitor her performance and improvement rate.

### D.    Security Policies

At a Xerox team meeting in August 2001, months before Plaintiff fielded a similar call, Mr. Bryant informed the team that an employee had transferred funds without verifying a caller's

password and that this mistake had cost Hewitt's client, Xerox, a lot of money. (Beamon Dep. at 113.) At this meeting Mr. Bryant stated that if these mistakes continued to occur, people would get written up and it would be held against them on their reviews. (Id.)

On October 17, 2001, Brian Doyle, one of Hewitt's senior executives, sent an email to all associates, including Plaintiff, which emphasized the importance of maintaining security of the confidential information of their clients' employees. This email stated that all associates were to follow the current security procedures and if an associate did not know what the procedures were, he was to contact his manager.

In Plaintiff's case, the security policy to which she was subject was the Xerox Security Policy dated October 1, 2001, which requires Xerox participants to provide their Social Security number and passwords (PIN) in order to access confidential information or to process transactions on the internet or through IVR, the automated voice-response system. (Bryant Decl. ¶ 16.) This security policy, although drafted by Xerox, was distributed to Hewitt's employees on Hewitt letterhead. (Beamon Dep. Ex. 3.)

At her deposition, Plaintiff confirmed her knowledge of the information contained in the October 1, 2001 Xerox Security Policy. Plaintiff explained that Xerox's security policy required a participant to manually enter his Social Security number and PIN on his telephone keypad before he could speak with a Hewitt CSA regarding specific information about his account. If the caller did not have his Social Security number and PIN, a CSA could only provide general information. A CSA was immediately aware of whether a Xerox employee had manually entered his PIN before the call was routed to the CSA because when the CSA pulled up the caller's information on her computer screen, the screen would appear white if the caller had already

entered his PIN into the phone system. The CSA's screen would be red if the caller had not entered his PIN, and the CSA would see a prompt reminding the CSA to request the information. (Beamon Dep. at 108-09, 112; Bryant Decl. ¶ 10-11.)


### E.    Security Breach

On November 12, 2001, Plaintiff fielded a call from Mr. Waxman, a Xerox plan participant, and helped him complete the transaction he had initiated online. Plaintiff stated that she did not ask for Mr. Waxman's PIN because Mr. Waxman would not have access to his account online if he had not entered his PIN and his Social Security number online, and because Mr. Waxman's call would not have been routed to her if he had not already entered his PIN into the phone system. (Beamon Dep. at 105-06, 108.) Plaintiff assisted Mr. Waxman by telling him the steps he should go through to transfer his funds into the Money Market Fund using the online system. However, Plaintiff then discovered that Mr. Waxman had never invested in the Money Market Fund before, so she asked him to logout because she believed there may be procedures she, as the CSA, would have to complete the first time he used the Money Market Fund. (Beamon Dep. Ex. 3 at 3-4.) Mr. Waxman logged out of his account online and remained on the phone while Plaintiff proceeded to direct his future contributions from one fund to another. The evidence shows that at no time during this phone call did Plaintiff verify any of Mr. Waxman's personal or identifying information except for his Social Security number. (Beamon Dep. Ex. 3 at 2; Bryant Decl. ¶ 27.) Plaintiff responds that because Mr. Waxman had accessed his online account by manually entering his PIN and Social Security number, that was sufficient to satisfy Xerox's security policy. (Beamon Dep. Ex. 2 at 1.3.)

- 5 -

Two days after this initial call, Mr. Waxman called again inquiring as to why his accounts did not reflect the changes he requested on November 12, 2001. (Bryant Decl. ¶ 26.) In response to this call, Mr. Bryant requested a tape recording of the November 12, 2001 call. (Id. ¶ 27.) After reviewing the call, Mr. Bryant determined that Plaintiff failed to confirm the caller's PIN and failed to transfer the entire fund balance per the caller's request, but merely redirected future contributions into the new fund. (Id.) Based on Plaintiff's failure to verify the caller's PIN before directing contributions into a different fund, Mr. Bryant determined that Plaintiff had violated both Xerox and Hewitt's security policies. He then informed Sara Norman, a Human Resources employee, that he had determined that Plaintiff had breached security. Ms. Norman agreed with Mr. Bryant's assessment that Plaintiff had violated Xerox and Hewitt's security policies. (Id. ¶ 29.) On November 20, 2001, Mr. Bryant and Ms. Norman terminated her employment. (Beamon Dep. at 118-19.)

### F.    Sexual Harassment Complaint Against Steve Bryant

Deborah Racic, one of Plaintiff's co-workers, initiated a sexual harassment complaint against Mr. Bryant with Hewitt's Human Resources Department. (Racic Decl. ¶ 3-4; Beamon Dep. at 79-80.) Ms. Racic met multiple times with Ms. Norman regarding her complaint and discussed the issues involving her sexual harassment claim. (Racic Decl. ¶ 4.) Ms. Racic informed Human Resources that she felt sexually harassed by Mr. Bryant's "behavior of intimidation, hostile conduct, and that it was interfering with [her] work performance." (Id. ¶ 5.) Ms. Reker felt that Mr. Bryant's "actions were clear, he displayed himself as [a] man that was stronger and dominating over [her] as a woman." (Id.) Ms. Norman told Ms. Racic that Human

Resources would investigate her harassment claim. (Id. ¶ 7.) Ms. Racic told Human Resources to speak with Plaintiff because Plaintiff was a witness to the harassment. (Id. ¶ 7, 12.) Ms. Reker did eventually file an EEOC complaint against Hewitt. (Id. ¶ 11.) She was also subsequently terminated while out on disability. (Id. ¶ 10.)

In the middle of June 2001, as part of its investigation of Ms. Racic's complaint, Human Resources required Plaintiff to share her knowledge of the alleged events between Ms. Racic and Mr. Bryant. Plaintiff was willing to cooperate, but wanted to remain neutral in the matter. (Pl.'s Am. Resp. to Local R. 56.1 Stmt. ¶ 2a.) Ms. Norman provided Plaintiff with a copy of Hewitt's Harassment and Discrimination Policy Statement and also told Plaintiff she could be terminated if she did not cooperate. (Id.; Norman's EEOC Statement.) Plaintiff reluctantly spoke with Ms. Norman on June 18, 2001. (Beamon Dep. at 81; Norman's EEOC Statement.)

There is no evidence that Mr. Bryant knew what questions were asked or what answers were given during Plaintiff's meeting with Ms. Norman. (Bryant Decl. ¶ 33.) Ms. Norman, however, spoke with Ms. Racic and Mr. Bryant about Ms. Racic's complaints before speaking with Plaintiff for the express purpose of further investigating Ms. Racic's complaints. (Beamon Dep. at 90-91.) Mr. Goemans, another CSA supervised by Mr. Bryant, also spoke with Ms. Norman about Ms. Racic's complaint. Mr. Bryant knew that both Plaintiff and Mr. Goemans spoke with Human Resources during their investigation of Ms. Racic's complaint, and in fact arranged their schedules so that they could talk with Ms. Norman about the harassment allegations. (Bryant Decl. ¶ 32-33.) Ultimately, Hewitt determined that Mr. Bryant had not engaged in harassment. (Bryant Decl. ¶ 34.) Mr. Bryant was not disciplined for Ms. Racic's complaint. (Keating Decl. ¶ 9; Bryant Decl. ¶ 34.)

### G. Security Breaches by Other Employees

Winfred Richmond, one of Plaintiff's co-workers, was given warnings after two security breach violations, and was not terminated until after his third breach. (Beamon Dep. at 117.) However, prior to Plaintiff's termination, Hewitt terminated approximately twenty-two other employees for violating client security policies. (Keating Decl. ¶ 7.) Neither Plaintiff nor Hewitt provide any additional information regarding the circumstances surrounding these twenty-two discharges. The record is devoid of any evidence regarding whether these alleged security violations pertained to transfer of funds, when they occurred, whether the employees were given warnings, or whether these employees had a similar position and performance record as Plaintiff.

## II.  Discussion

### A. Summary Judgment Standard

Summary judgment is appropriate when the record shows "that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Sinkler v. Midwest Prop. Mgmt., Ltd.*, 209 F.3d 678, 683 (7th Cir. 2000). In determining whether summary judgment is appropriate, the Court must view the evidence, and draw all reasonable inferences therefrom, in the light most favorable to the non-moving party. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986); *Kennedy v. United States*, 965 F.2d 413, 417 (7th Cir. 1992). However, if the non-movant bears the burden of proof on an issue he or she may not simply rest on the pleadings, but rather must affirmatively set forth specific facts establishing the existence of a genuine issue of material fact. *See Celotex*, 477 U.S. at 322-26.

Summary judgment is appropriate when the non-moving party "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Id.* at 322. If taking the record in its entirety cannot lead a rational trier of fact to find for the non-moving party, then there is no genuine issue for trial and summary judgment must be granted. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

### B.   Retaliation

Hewitt argues that Plaintiff cannot establish a *prima facie* case of retaliation and thus claims it is entitled to summary judgment as a matter of law. Hewitt also argues that even if Plaintiff can establish a *prima facie* case, Hewitt has provided a legitimate nondiscriminatory reason for terminating Plaintiff's employment and Plaintiff cannot prove this reason was merely a pretext.

Under Title VII, it is "an unlawful employment practice for an employer to discriminate against any of his [employees] . . . because [the employee] has opposed any practice made an unlawful employment practice by this subchapter, or because [the employee] has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter." 42 U.S.C. § 2000e-3(a). A plaintiff has two distinct methods of defeating summary judgment when alleging retaliation; the direct method or the indirect method, also known as the *McDonnell Douglas* burden-shifting method. *Stone v. City of Indianapolis Pub. Utils. Div.*, 281 F.3d 640, 644 (7th Cir. 2002). Under the direct method a plaintiff must show either through direct or circumstantial evidence that she engaged in protected activity and as a

result suffered the adverse employment action of which she complains. *Adams v. Wal-Mart Stores, Inc.*, 324 F.3d 935, 938-39 (7th Cir. 2003). "Direct evidence essentially requires an admission by the decision-maker that his actions were based on the prohibited animus." *Radue v. Kimberly-Clark Corp.*, 219 F.3d 612, 616 (7th Cir. 2000). Circumstantial evidence is evidence that allows a jury to infer intentional discrimination by the decision-maker. *Rogers v. City of Chicago*, 320 F.3d 748, 753 (7th Cir. 2003). In the present case, Plaintiff's evidence does not meet the direct method standard and thus her Title VII claim must proceed under the *McDonnell Douglas* burden-shifting method. *See also O'Regan v. Arbitration Forums, Inc.*, 246 F.3d 975, 983 (7th Cir. 2001).

Under the *McDonnell Douglas* burden-shifting method Plaintiff must show that: (1) she engaged in a statutorily protected activity; (2) she was performing her job in a satisfactory manner; (3) she suffered an adverse employment action; and (4) she was treated less favorably than any other similarly situated employee who did not engage in the protected activity. *See Hilt-Dyson v. City of Chicago*, 282 F.3d 456, 465 (7th Cir. 2002). A failure to satisfy any element of the *prima facie* case will prove fatal to Plaintiff's retaliation claim. *See id.*

Even if Plaintiff proves all of these elements, Hewitt has a chance to win at summary judgment if it presents evidence of a non-invidious reason for the adverse action. *See Hilt-Dyson*, 282 F.3d at 465; *Stone*, 281 F.3d at 644. However, once Hewitt comes forward with a legitimate, nondiscriminatory reason for terminating Plaintiff's employment, the burden of production shifts back to Plaintiff to show that Hewitt's reason is pretextual. *See Hilt-Dyson*, 282 F.3d at 465. If Plaintiff cannot show that Hewitt's reason is pretextual, Hewitt's motion for summary judgment will be granted.

1.     Plaintiff Was Engaged in a Protected Activity.

Hewitt contends that Plaintiff did not establish a *prima facie* case of retaliation because she failed to show that she engaged in a statutorily protected activity. Hewitt argues that while Plaintiff knew Ms. Racic's complaint was due to alleged harassment Plaintiff did not know it was related to sexual harassment and in fact, Hewitt maintains that the complaint was never based on sex. The Court finds that Plaintiff was involved in a protected activity because she reasonably believed Ms. Racic's complaint was protected under Title VII.

Employers are not allowed to retaliate against employees who complain about discrimination or other practices that violate Title VII. 42 U.S.C. § 2000e-3(a); *Sitar v. Indiana Dep't of Transp.*, 344 F.3d 720, 727 (7th Cir. 2003); *Miller v. Am. Family Mut. Ins. Co.*, 203 F.3d 997, 1007 (7th Cir. 2000). Even if the challenged practice does not actually violate Title VII, an employee may engage in statutorily protected expression if she reasonably believes she is challenging conduct that is in violation of Title VII. *Dey v. Colt Const. & Dev. Co.*, 28 F.3d 1446, 1457-58 (7th Cir. 1994). Therefore, Plaintiff is not required to show that the underlying complaint actually involved sexual harassment under Title VII, because she is protected from retaliation if: (1) subjectively Plaintiff had good faith belief that her involvement opposed a practice prohibited under Title VII, and (2) her belief was objectively reasonable that her involvement in the alleged sexual harassment investigation is protected under Title VII. *See Hamner v. St. Vincent Hosp. & Health Care Ctr., Inc.*, 224 F.3d 701, 707 (7th Cir. 2000); *Dey*, 28 F.3d at 1457-58.

Plaintiff's involvement in Ms. Racic's sexual harassment complaint against Mr. Bryant constituted a protected activity because Plaintiff subjectively believed she was participating in a

complaint of sexual harassment, and her belief was objectively reasonable. Ms. Racic had filed a

sexual harassment complaint against Mr. Bryant with Hewitt's Human Resources Department

and later filed a complaint with the EEOC. While investigating Ms. Racic's complaint,

Ms. Norman from Human Resources contacted Plaintiff and asked to meet with her to discuss

Ms. Racic's various allegations against Mr. Bryant. In response to Human Resources's inquiries

Plaintiff corroborated Ms. Racic's story.

Filing a sexual harassment complaint and participating in its investigation are protected

activities under Title VII. 42 U.S.C. § 2000e-3(a). "[A]n employee need not use the magic

words 'sex' or 'gender discrimination' to bring her speech within Title VII's retaliation protections

. . . ." *Sitar*, 344 F.3d at 727. However, the employee must "at least say something to indicate

her [gender] is an issue." *Miller*, 203 F.3d at 1008. It was reasonable for Plaintiff to think that

her involvement in the investigation was protected activity, especially because Ms. Norman

provided Plaintiff with a copy of Hewitt's discrimination policy, which discusses and forbids,

*inter alia,* sexual harassment.

Hewitt contends that even if Plaintiff can prove she engaged in a protected activity she

cannot prove Mr. Bryant knew the reason Plaintiff spoke with Human Resources and "in order

for the employer to retaliate, it must be aware of the employee's statutorily protected expression."

*Kaminski v. Freight-A-Ranger, Inc.*, 01 C 4937, 2002 WL 31174461, at *6 (N.D. Ill. Sept. 30,

2002); *Miller*, 203 F.3d at 1008 (employer cannot retaliate when it is unaware of any

complaints). In this case, Mr. Bryant knew about Ms. Racic's complaint against him and Human

Resources had already spoken with Mr. Bryant while investigating Ms. Racic's complaint.

Ms. Norman also spoke with Mr. Bryant, at Plaintiff's request, to get his permission to speak with

Plaintiff during her shift. Mr. Bryant allowed Plaintiff to speak with Human Resources and arranged to have another employee cover Plaintiff's calls during the meeting. The logical conclusion to the chain of events listed above is that Mr. Bryant knew Plaintiff spoke with Human Resources regarding Ms. Racic's complaint of sexual harassment against him.

Therefore, based on the evidence in the record and taking the facts in the light most favorable to Plaintiff, the Court finds that Plaintiff engaged in a protected activity under Title VII.

### 2. Plaintiff Did Not Perform Her Job in a Satisfactory Manner.

Next, the second element Plaintiff must establish in order to prove her *prima facie* case of retaliation is that she performed her job in a satisfactory manner. *See Hilt-Dyson*, 282 F.3d at 465; *Stone*, 281 F.3d at 644. Because Plaintiff cannot demonstrate that she was meeting her employer's legitimate employment expectation at the time of termination, her retaliation claim is doomed. *See Peele v. Country Mut. Ins. Co.*, 288 F.3d 319, 328 (7th Cir. 2002); *Hilt-Dyson*, 282 F.3d at 465.

In the present case, Plaintiff does not show that she performed her job in a satisfactory manner. In fact, Hewitt has provided evidence that Plaintiff was not meeting its legitimate expectations. In May 2001, at her initial meeting with Mr. Bryant, Plaintiff was found to be deficient in her MAGIC and accuracy skills. (Bryant Decl. ¶ 18.) Plaintiff's MAGIC scores were still very low during her July and August 2001 meetings, although she was told her accuracy scores were improving. (Bryant Decl. ¶ 20-21.) However, Mr. Bryant remained dissatisfied with her performance because he did not feel her MAGIC skills were improving enough, and for this

reason, in October 2001 he placed Plaintiff on a sixty-day performance improvement plan. Then on November 12, 2001, Plaintiff violated her employer's security policy when she transferred funds for Mr. Waxman, a Xerox plan participant, without first verifying his PIN.

Plaintiff points out that Mr. Waxman was online attempting to complete a financial transaction on his account when he called for assistance. She argues that she was excused from being required to ask Mr. Waxman for his PIN because he already entered that information into the phone system before his call was routed to her and he would have needed to enter his PIN online before accessing his account information. However, the record indicates that Hewitt requires CSAs, which includes Plaintiff, to verify a caller's PIN unless the caller is merely requesting general information; there exists no exception in the security policy which excused this standard. (Beamon Dep. at 69-73, 113; Beamon Dep. Ex. 2; Bryant Decl. ¶¶ 15-16; Keating Decl. ¶ 8.) Plaintiff breached Hewitt and Xerox's security policy when she opened Mr. Waxman's account without his PIN and when she processed a financial transaction without his PIN. (Bryant Decl. ¶ 28.) Plaintiff also erred when she directed Mr. Waxman's future contributions to a different fund without transferring the entire existing fund balance as he requested. Due to performance problems and the security violation involving transfer of funds, and considering the importance of the security standards to Hewitt, Plaintiff has failed to prove that she was meeting her employer's legitimate work performance expectations.

### 3.    Plaintiff Suffered an Adverse Employment Action.

It is undisputed that Plaintiff suffered an adverse employment action and therefore satisfied the third element needed to establish a *prima facie* case of retaliation. The Seventh

Circuit has indicated numerous times that a termination of employment is a materially adverse action. *E.g., Hilt-Dyson*, 282 F.3d at 465; *Ribando v. United Airlines, Inc.*, 200 F.3d 507, 511 (7th Cir. 1999). Plaintiff's employment was terminated and thus she suffered an adverse employment action.

### 4. Plaintiff Cannot Prove She Was Treated Less Favorably Than Other Similarly Situated Employees Who Did Not Engage In the Protected Activity.

Finally, the last element Plaintiff needs to establish in order to prove her *prima facie* case of retaliation is that she was treated less favorably than other similarly situated employees who did not engage in the protected activity. *See Rogers*, 320 F.3d at 754-56; *Hilt-Dyson*, 282 F.3d at 465; *Stone*, 281 F.3d at 644. She must demonstrate that the other alleged similarly situated employee is "directly comparable to her in all material respects." *See Peele*, 288 F.3d at 330 (quotation omitted). When a plaintiff claims she was disciplined more harshly than similarly situated employees based on a prohibited reason, the "plaintiff must show that [she] is similarly situated with respect to performance, qualifications, and conduct." *Radue*, 219 F.3d at 617. Similarly situated also normally includes demonstrating that the two employees were supervised by the same person, were subject to the same standards, and had engaged in similar conduct without any circumstances that would distinguish their conduct or the employer's treatment of them. *Id.* at 617-18. Employees in the same position as the plaintiff, but who have fewer performance problems, are not considered similarly situated. *Fuka v. Thomson Consumer Elec.*, 82 F.3d 1397, 1405-06 (7th Cir. 1996).

In the present case, Plaintiff did not prove that she was treated less favorably than similarly situated employees who did not engage in the protected activity because the record is devoid of any evidence of other employees who are similar to her in regards to work record, qualifications, or conduct. *See Durkin v. City of Chicago*, 341 F.3d 606, 613-14 (7th Cir. 2003). Plaintiff maintains that she has satisfied this element of the *prima facie* case when she provided evidence of co-workers receiving their monthly performance feedback meetings with Mr. Bryant, while she was not given monthly meetings with Mr. Bryant. Plaintiff contends that this fact demonstrates the negative treatment she received in contrast to her co-workers.[2] However, the test is not whether she was treated worse than her co-workers, but whether she was treated worse than similarly situated employees. *See Peele,* 288 F.3d at 330. Plaintiff's proffered evidence does not prove that she was comparable to her co-workers in work record (or in any other respect) and thus she fails to prove that these employees were similarly situated to her. *See Rogers,* 320 F.3d at 755.

In another effort to present a similarly situated employee who was treated better than her, Plaintiff puts forth evidence regarding Winfred Richmond. Mr. Richmond is Plaintiff's co-worker who violated Hewitt's security policy three times before his employment was terminated. Plaintiff contends that because Mr. Richmond was able to violate security three times before he was discharged, as opposed to her termination after only one alleged security violation, Hewitt treated her worse than it treated Mr. Richmond, an employee who did not engage in the protected activity. However, Plaintiff failed to show that Mr. Richmond was similarly situated to herself in respect to work performance and conduct. There is no evidence in the record that he was ever

_____

[2] The failure to have monthly meetings with Bryant is not necessarily worse treatment.

placed on a performance improvement plan, nor is there evidence that his security violations involve the transfer of funds. Moreover, during his first two security violations Mr. Richmond was not part of the Xerox team and was not supervised by Mr. Bryant. Having the same supervisor is a typical requirement when determining similarly situated individuals. *Radue*, 219 F.3d at 617-18. Therefore, Plaintiff has failed to establish that Mr. Richmond was similarly situated to her and thus has failed to establish her *prima facie* case of retaliation. *See Hilt-Dyson*, 282 F.3d at 465; *Stone*, 281 F.3d at 644.

### 5. Hewitt Can Establish a Legitimate, NonDiscriminatory Reason for Firing Plaintiff.

Even if Plaintiff had met her burden and established her *prima facie* case of retaliation, Hewitt would still have the opportunity to prevail on its motion for summary judgment by producing evidence of a legitimate, nondiscriminatory reason for terminating her employment. *See Adams*, 324 F.3d at 940; *Stone*, 281 F.3d at 644. Once Hewitt presents its non-invidious reason for terminating Plaintiff's employment, the burden of production shifts back to Plaintiff to show that Hewitt's reason is pretextual. *Hilt-Dyson*, 282 F.3d at 465. To demonstrate this, Plaintiff must show that the retaliation was the most likely motive for the termination. *See Worth v. Tyer*, 276 F.3d 249, 265 (7th Cir. 2001). Alternatively, she may show that Hewitt's reason for terminating her employment was not worthy of belief because it either: (1) had no basis in fact; (2) did not actually motivate her discharge; or (3) was insufficient to motivate her discharge. *See id.* at 266; *Wells v. Unisource Worldwide, Inc.*, 289 F.3d 1001, 1006 (7th Cir. 2002); *Velasco v.*

*Ill. Dept. of Human Servs.*, 246 F.3d 1010, 1017 (7th Cir. 2001). Hewitt's explanation must be dishonest, not a mere business error. *See Wells*, 289 F.3d at 1006.

In this case, as discussed, Hewitt asserts that Plaintiff's employment was terminated because she violated Hewitt's security policy and the security policy of Xerox, Hewitt's client. Hewitt has provided a legitimate reason for terminating Plaintiff's employment. The burden now shifts to Plaintiff to prove Hewitt's reason is pretextual. *See Hilt-Dyson*, 282 F.3d at 465.

In attempting to prove pretext Plaintiff argues that she did not violate Xerox's security policy because Mr. Waxman had already entered his PIN online and on the phone system and she asserts that is all that is required by Xerox's policy.[3] Hewitt confirms that the Plaintiff's computer screen would have looked different depending on whether Mr. Waxman had entered his PIN. (Bryant Decl. ¶ 10-11.)

Nevertheless, the Court finds that Plaintiff violated both Xerox and Hewitt's security policies when she failed to verify Mr. Waxman's PIN before transferred funds on his account per his request. In August 2001, several months before her November 2001 phone call from Mr. Waxman, Mr. Bryant informed the Xerox team about the wrongful act of another employee who had transferred funds without first verifying the PIN and indicated that if such a mistake happened again the erring CSA would be disciplined. (Beamon Dep. at 113.) These undisputed facts support Hewitt's contention that it required CSAs to confirm a caller's PIN before

_____

[3] Plaintiff also contends that her employer, Hewitt, did not have a security policy in place for her to violate when she was employed at Hewitt. Plaintiff bases this assertion on the fact that even though Hewitt provided a security policy dated October 1, 2001, it was merely Xerox's security policy placed on Hewitt's letterhead. However, because Xerox was Hewitt's client and because this security policy was placed on Hewitt's letterhead, this Court finds that Hewitt did have a security policy in place prior to Plaintiff's termination.

authorizing monetary transactions. This fact also demonstrates that Plaintiff was aware of Hewitt's policy that CSAs must verify the PIN before transferring funds. Hewitt placed great importance on maintaining the security of their clients' employees. Plaintiff has failed to demonstrate that when she did not verify Mr. Waxman's PIN she did not give Hewitt cause to terminate her employment.

Upon review of the record, we are convinced that Hewitt's asserted reason for the discharge was supported by the evidence and Plaintiff has failed to prove the proffered reason had no basis in fact, did not actually motivate her discharge, or was insufficient to motivate her discharge. *See Velasco*, 246 F.3d at 1018. Therefore, Plaintiff is unable to rebut Hewitt's non-invidious reason for terminating her employment and for this reason Hewitt's motion for summary judgment should be granted.

### III. Conclusion

For all the above stated reasons, Defendant Hewitt's motion for summary judgment is granted.


**MARTIN C. ASHMAN**
Dated: September 7, 2004.                United States Magistrate Judge

Copies have been mailed to:

MS. LINDA L. BEAMON
812 Perry Drive, Apartment #1B
Mundelein, IL 60060

DAVID S. BAFFA, Esq.
PAMELA Q. DEVATA, Esq.
Seyfarth Shaw, LLP
55 East Monroe Street
Suite 4200
Chicago, IL 60603

*Pro Se* Plaintiff

Attorneys for Defendant